UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL DOCKET NO. 13-101** |
| **VERSUS** | **SECTION R** |
| **CHRISTOPHER WHITE** | |

## REPLY MEMORANDUM

MAY IT PLEASE THE COURT:

The prosecution's comparison of Chris White to the likes of Mark Morad and Paige Okpalobi to justify its request for an eye-popping 80-month sentence is off-base. The evidence at trial clearly established that Mr. White was practically a non-entity (in that he was not mentioned in the prosecution's opening statement, or by prosecution witnesses Mark Morad, Demetrias Temple, and Latausha Dannel—not even once). A sentence even near 80 months, when this Court has sentenced Jo Ann Murthil to 48 months, and Latausha Dannel to 24 months, would create an unwarranted sentencing disparity. *See* 18 U.S.C. § 3553(a)(6).

### A. Mr. White did not coordinate the payment of kickbacks, and was not intimately familiar with the companies' operations.

Throughout its memorandum, the prosecution places Mr. White at the center of Morad's universe, attributing to him knowledge of Temple's illegal activities, placing him at certain meetings, and naming him as the coordinator of payments. In support of these allegations, the prosecution provides a single FBI Form 302 of an interview with Temple. Temple's statements in this document have never survived the crucible of cross-examination, have never been provided under oath, and are not corroborated by any external document.

This lies in stark contrast to the prosecution's theory at trial, explained by Mr. Kanellis:

>The recruiter, when they contacted Memorial, would reach out to Joe Ann Murthil, Memorial's office manager, who ran Memorial on a day-to-day basis. Joe Ann Murthil would calculate, you will see, the amount that the recruiter was supposed to be paid and would inform the person who wrote the check, the guy who ran the whole operation whose name is Mark Morad, you will hear that name a lot. Mark Morad would then write the check to the recruiter with Joe Ann Murthil's help.

Trial Transcript at 8:2-9 (opening statement). Moreover, the testimony at trial painted a very different picture than that offered in the prosecution's sentencing memorandum.

At trial, Demetrias Temple's testimony made it clear that she dealt with Ms. Murthil and Ms. Dannel when it came to patient referrals. She further testified that she only dealt with Murthil, Dannel, Morad, and Okpalobi. She never once mentioned Mr. White:

>Q. Did you eventually end up marketing for Morad?
>
>A. I did.
>
>Q. Do you know the time frame?
>
>A. Between -- I started probably between the end of '09 and the beginning of 2010. Between '09 and 2010, I believe.
>
>Q. When you started marketing for Mark Morad's companies in 2009, beginning of 2010, did you know someone named Joe Ann Murthil?
>
>A. I did.
>
>Q. Did you know someone named Latausha Dannel?
>
>A. I did.
>
>Q. And what was your understanding, at the time, of the roles that Tausha and Joe Ann played?
>
>A. Tausha and Joe Ann ran the office. It was, like, manage it. The one that would intercede between me and Mark or me and Paige.
>
>Q. So what offices did Latausha run?
>
>A. Interlink.
>
>Q. And what office did Joe Ann run?
>
>A. Memorial Home Health.
>
>Q. And when you were dealing with Memorial and Interlink, did you deal with anyone other than Joe Ann and Tausha?
>
>A. No. No, sir, I didn't.

Trial Transcript at 757:20 – 758:15 (Testimony of Demetrias Temple).

Temple further elaborated on her recruiting activities, and the means by which she was paid by Morad:

> Q. So after you started working with Morad at his companies, going out and seeing these patients, did you begin to understand what Tausha and Joe Ann's responsibilities were at these companies?
>
> A. Yes, I did.
>
> Q. And how did you learn that? How did you become aware of that?
>
> A. I became aware of it because if I had a problem, I would go to them about anything, about the nurses not listening to patients or not showing up, problem patients, how many patients that I got paid on. Any problem I have. They kind of ran the office.

*Id.* At 770:4-12. Again, there is no mention of Mr. White. Murthil and Dannel ran the office; not Mr. White. Further, Murthil and Morad coordinated Temple's payments:

> Q. And after those numbers were good, would Joe Ann, then, tell you how much you were going to be paid based upon the number of patients?
>
> A. How many -- yes, she would tell me, "You got ten patients, so he is going to pay you on ten patients this week."

*Id.* at 772:24 – 773:3.

> Q. You indicated earlier that you got paid by -- you got paid by Mark Morad, right?
>
> A. Yes, sir.
>
> Q. Did anyone assist Mark Morad with respect to the payments you received at Memorial?
>
> A. Yes, sir.
>
> Q. Who is that?
>
> A. Joe Ann and Tausha.

*Id.* at 778:5-12. In response to this open-ended question as to who assisted Morad with coordinating payments, Temple's response was Murthil and Dannel. Not White.

Even Temple's vague recount of whether she would be salaried was confined to a conversation she had with Mark Morad, only. *See id.* at 785. The other meetings concerning Temple were similarly confined to Morad, Murthil, and Dannel. Again, there is no mention of White:

3

> Q. There was never a meeting where you met with Mark Morad, Joe Ann Murthil, yourself, Latausha Dannel, Nicole Oliver, or anybody else to discuss --
>
> A. My pay. But we have met in meetings, Joe Ann, myself, and Mark.
>
> Q. The date?
>
> A. I can't tell you what date it was. But I can use the example that when the feds start coming on us, they wanted me to stop going out with the doctors. We met in Joe Ann's office, and the reason for that is because Medical Specialists was paying me too slow for the patients.

*Id.* at 821:15-25.

Latausha Dannel, a cooperating defendant who testified for the prosecution, never mentioned Chris White in her testimony.

During his testimony, Mark Morad first explained the hierarchy of employees:

> Q. Who worked for you at Memorial?
>
> A. Joe Ann Murthil was the office manager.
>
> Q. And you say she was the office manager. Can you describe some of her responsibilities as office manager?
>
> A. She was over all clerical at the office, everybody reported to her. And also she was my contact person. She is the only person that I trusted. She is the only person I talked to either when I went there or by phone.

*Id.* at 346:21 – 347:3 (Testimony of Mark Morad).

On direct examination, the prosecutor repeatedly questioned Morad about the coordination of kickbacks to Temple. Morad repeated that he dealt with Murthil and Dannel. He never mentioned White:

> Q. And did you have conversations with other individuals at your companies regarding the impropriety of selling Medicare numbers?
>
> A. Yes.
>
> Q. And who did you talk to about this sort of thing?
>
> A. Me and Latausha, Latausha Dannel, Paige Okpalobi, and Joe Ann Murthil.

*Id.* at 354:19-24.

> Q. Did you -- you said Joe Ann and Latausha -- Joe Ann at Memorial was the only one that you talked to?
>
> A. Only one I trusted.

4

> Q. With respect to Demetrias Temple, why is that?
>
> A. I did not want anyone else in the office to know that I was paying kickbacks to Demetrias Temple or that's how we were getting our patients.

*Id.* at 356:13-19.

Morad further explained the lengths he went to keep his arrangement with Temple under wraps:

> At the beginning, we were very uncomfortable with Dee going into the office. I did not want the director of nursing or any of the other clerical employees to know I was paying for patients. So, therefore, me and Joe Ann, we talked about the best interest of both of us was to have Demetrias Temple come to Prytania Street at my administrative office and I paid Dee directly from that office.

*Id.* at 357:5-11.

> Q. You never instructed Ms. Murthil or any other person that worked for Memorial that they could pay a kickback to a patient for signing on to Memorial, did you?
>
> A. They would refer the nurses and the aides to me, and I would actually cut the check. They would check the patient's benefit information for me --
>
> Q. My question was --
>
> THE COURT: His question was kickbacks to patients.
>
> THE WITNESS: No, they did not pay, I am the only one that paid that.

*Id.* at 474:8-17.

If anything can be gained from the evidence at trial, it is that Mr. White was a non-entity. He was not "intimately involved" as the prosecution suggests. No witness put Mr. White in a meeting, and no witness testified that Mr. White coordinated the payment of illegal kickbacks. The trial testimony clearly established that Mr. White was well below Murthil and Dannel in the hierarchy of Morad's companies, not only when it came to trust, power, and control, but also knowledge.

**B. The prosecution continues to misapprehend the significance of the 1099s and incorrectly attributes obstructive behavior that is not supported by the trial testimony.**

As an initial matter, the prosecution is flatly incorrect that Mr. White "backdated" Form 1099s. Form 1099s do not have a date, other than to identify the year in which the payments were made. Mr. White did not backdate anything, and was fully forthcoming when he described when and the circumstances under which the Form 1099s were created.

Next, the prosecution misapprehends the fact that the Form 1099s were accurate, because they reflected the payments from Goldwell to Temple. Temple was paid out of a Goldwell account:

> Q. Mr. Morad, what is this document?
>
> A. This is a check from Goldwell Investments to Demetrias Temple for $6,000.
>
> Q. What's the date on this document?
>
> A. 5/20/2011.
>
> Q. Do you know what the $6,000 payment on May 20th, 2011, was related to?
>
> A. It was for patient referrals for the week of 5/20/2011.
>
> Q. Can we go back to Exhibit No. 303. What is the date at the top, top left-hand corner of that document?
>
> A. 5/20/2011.
>
> Q. And who, Mr. Morad, calculated that Demetrias Temple was to be paid $6,000 on 5/20/2011?
>
> A. Joe Ann Murthil.

Trial Transcript at 361:12-25 (Testimony of Mark Morad); *see also* Gov't Ex. 207.

> A. This check is from me, Goldwell Investments, to Demetrias Temple. That's a check for $10,800. It's for patients.
>
> Q. And how did you know that you were supposed to pay Demetrias Temple $10,800 on May 6, 2011?
>
> A. I received a report from Joe Ann with a patient list, the patients that we admitted.
>
> Q. Mr. Morad, did anyone other than Joe Ann create these lists to tell you how much Demetrias Temple was supposed to be paid?

6

>A. No, she was the only one. She is the only one that I trusted with this information.

*Id.* at 366:18 – 367:2.

>Q. And with respect to those checks, Ms. Murthil didn't have any signing authority on those, correct?
>
>A. No. She was to hand the checks to Demetrias Temple.
>
>Q. The checks weren't -- that were handed to Demetrias Temple would have been drawn on Goldwell and bore your signature, correct?
>
>A. That's correct. Either I would take the checks to her or she would come pick them up. And it was more than just Demetrias. Janet Watson. I had those checks separated from regular payroll, so she would have to hand them the checks.

*Id.* at 458:4-12.

>Regarding the creation of a personnel file, Morad testified that
>
>Q. Did you do anything else in response to the grand jury subpoena?
>
>A. Yes. Me and Paige Okpalobi and Demetrias Temple, we created personnel files for her and fake contracts so it would look like she was not a patient recruiter.
>
>Q. You mean -- by "her," you mean Demetrias Temple?
>
>A. Correct.
>
>Q. And why did you create fake contracts in those records?
>
>A. Paying for patients are illegal. I did not want anyone to know that we were paying Demetrias Temple kickbacks for patients.
>
>Q. And so did you submit that, those fake documents in response to the grand jury subpoena?
>
>A. Yes, we did.
>
>Q. So you lied?
>
>A. Yes.

*Id.* at 389:9-23. Morad unequivocally explained that together with Okpalobi and Temple, he created a personnel file for Temple to make it appear as though she was an employee. In response to this open-ended question, Morad never mentioned Mr. White, or his involvement. But even taking Mr. White's grand jury testimony into account concerning the creation of the 1099 to reflect the payments to Temple, it did no more than accurately account for the history of

7

payments to Temple. It did not make them legal under the Medicare regulations. It did not change her status to a bona fide employee such that the payments would have been legal. It did not conceal material facts from the prosecution.

### C. The loss figure, although contained in the factual basis, is still unsupported by evidence.

The prosecution correctly points out that the $2.2 million loss figure is included in Mr. White's factual basis. At the time Mr. White signed his factual basis, however, he did not know how that number was calculated, or that it would be used to determine his sentencing guideline range, further underscoring his claim that he received ineffective assistance of counsel. To this day, Mr. White, the probation officer, and the Court do not appear to possess a single fact to support how the prosecution arrived at this calculation, and why it is attributable to Mr. White. As demonstrated above, the prosecution's broad references to the evidence at trial did not implicate Mr. White, at all. And that is not merely because Mr. White was not on trial. Morad, Okpalobi, and Dannel were not on trial, either, but there was ample testimony concerning their roles. Mr. White, however, was not mentioned. In fact, Morad's testimony made it clear who was responsible for billing Medicare for false claims, undermining the assertions in Mr. White's factual basis that he aided in the submission of claims:

> Q. Did you bill Medicare for visits that were missed?
> A. Yes, we did.
> Q. And who submitted the claims at Interlink?
> A. Latausha Dannel.
> Q. And who submitted the claims at Memorial?
> A. Joe Ann Murthil.

Trial Transcript at 381:6-11 (Testimony of Mark Morad).

### D. The mass-marketing enhancement does not apply because the conduct was not reasonably foreseeable to Mr. White.

Mr. White does not dispute that Demetrias Temple engaged in mass-marketing. Mr. White's offense level, however, should not be enhanced on this basis because the conduct was not reasonably foreseeable to him. At trial, Temple described, mailing 1,500 flyers per week; but she never mentioned Mr. White or anyone else at Morad's companies suggesting, directing, or reimbursing her for this mass-marketing. *See* Trial Transcript at 759-60. The Fifth Circuit has applied this enhancement when the defendant, herself, engaged in the conduct, or to a defendant who directed the conduct. The testimony at trial established that Mr. White was removed from Temple's recruiting activities, and that it was Murthil and Morad who discussed the sum she would be paid. No testimony places Mr. White in any of these conversations. Because "relevant conduct includes 'all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,'" the enhancement does not apply to Mr. White. *See United States v. Isiwele*, 635 F.3d 196, 205 (5th Cir. 2011) (Isiwele instructed the recruiter) (citing *United States v. Mauskar,* 557 F.3d 219 (5th Cir. 2009); U.S.S.G. § 1B1.3(a)(1)(B).

### E. Mr. White does not possess a special skill to justify a § 3B1.3 enhancement.

The prosecution relies on *United States v. Kuhrt*, 788 F.3d 403, 409 (5th Cir. 2015) to defend a two-level enhancement for abuse of a special skill because Mr. White was an accountant, but this enhancement is generally reserved for *Certified Public Accountants*. In imposing the enhancement on Kuhrt, who was not a CPA, the Fifth Circuit specifically noted that he nonetheless had a Masters of Business Administration. Mr. White has no such advanced degree. He only has a bachelor's degree in accounting, with no further education or certifications.

F.  **Conclusion.**

In light of the trial testimony outlined above, together the arguments set forth in Mr. White's original sentencing memorandum, Mr. White moves the Court to amend the PSR to account for his objections to the guideline calculations, find that even with those revisions, that the guideline range overstates the seriousness of the offense and Mr. White's role in the offense, and fashion a sentence that is consistent with those that the Court has imposed on other defendants.  Mr. White's role was far inferior to that of Ms. Murthil, who was sentenced to 48 months, and the trial testimony further shows that he did not possess the knowledge of Ms. Dannel, who was sentenced to 24 months.  Accordingly, a sentence less than 24 months would reflect the degree of culpability as reflected by the evidence in this case.

Respectfully submitted,

*/s/Sara A. Johnson*
Sara A. Johnson (La. Bar No. 31207)
700 Camp Street
New Orleans, LA 70130
(504) 528-9500
sara@sarajohnsonlaw.com

Attorney Christopher White

**CERTIFICATE OF SERVICE**

This certifies that I filed the foregoing using the CM/ECF system, which will send a copy to all counsel of record.

Dated:  September 27, 2016.

*/s/Sara A. Johnson*
Sara A. Johnson